# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | |
|---|---|
| LISA METZGER,<br><br>  *Plaintiff,*<br><br>   v.<br><br>CITY OF MONROE,<br>NORTH CAROLINA, et al.,<br><br>  *Defendants.* | Case No. ___3:25-cv-891___<br><br><br>MOTION FOR<br>PRELIMINARY INJUNCTION<br>AND<br>MEMORANDUM IN SUPPORT |

## Motion

Plaintiff Lisa Metzger, by counsel, moves for a preliminary injunction under Fed. R. Civ. P. 65(a). Defendants' next meeting is November 25, 2025. Plaintiff needs preliminary relief to prevent further irreputable harm to her constitutional rights.

## Memorandum in Support

The First and Fourteenth Amendments protect individuals' rights to free speech, petition, and freedom from unreasonably overbroad and vague laws. However, the Monroe City Council conducts its meetings as if these rights do not exist.

The Monroe City Council established rules for the public comment period of its meetings, which the mayor enforces, to intimidate and prevent the public from directly criticizing or petitioning the Council. Indeed, speakers must reveal their personal primary residence address or forfeit their speaking opportunity. And if they dare reveal where they live and expose themselves to retaliation against themselves or their property, the Council's public comment period rules shield

council members from direct petition and criticism. Specifically, the rules have overbroad and vague prohibitions against "yelling" at, being "rude" to, or "insulting" the city council. And any speech the council arbitrarily considers to be "profanity, abusive language, public ridicule, or personal attacks" empowers them to order law enforcement officers to eject a person from the meeting.

These rules censor and "chill" free speech. People are entitled to First and Fourteenth Amendment protection when they address the Monroe City Council. Accordingly, the Court should grant plaintiff's motion for a preliminary injunction.

**Factual Background**

## I. Monroe's Public Comment Period Rules

At least once per month, the City of Monroe's City Council is required to hold a public comment period during one of its regular meetings. *See* N.C. Gen. Stat. §§ 160A-71(a); 160A-81.1. Monroe's mayor, Robert Burns, is the presiding officer "at all council meetings." *Id*. at § 160A-69.

The Council enacted the "Rules Governing Public Comment Period and Rules of Decorum During City Council Regular Meetings" (Oct. 14, 2025) (the "Rules"), *available at* https://tinyurl.com/4wy7y5dk, to govern the public comment period. The Rules allow anyone from anywhere to speak on any topic during the public comment period, except for topics being raised during the public hearing portion of the meeting if one is scheduled. *See* the Rules §§ 2, 11, 15. The Rules prioritize speakers from Monroe in the speaking order, followed by Union County residents, and then everyone else. *Id*. at § 4.

## A. The Rules compel speakers to reveal where they live.

The current version of the Rules requires each public comment period participant to reveal exactly where they live to the council on a signup form and to the audience just before they speak. Section 2 states:

> Each person desiring to speak during the Public Comment Period shall sign up to speak prior to the start of the meeting on the form provided by listing their name, full street address of their personal primary residence and not business or other address, topic on which he or she will speak, and whether a City of Monroe resident, Union County resident, or other place of residency. . . . A speaker shall verbally state their name, street address, city, and state of their personal primary residence and not business or other address when called to speak prior to making any public comments. Any speaker that signs up and fails or refuses to give all the required information will not be called on to comment or forfeit their time to speak during the public comment period.

Until October 14, 2025, when the current version of the Rules was adopted, the speaker's address was also available to anyone that watched the meeting on the internet. *See* City of Monroe NC Government, *City Council Meetings*, YOUTUBE, https://tinyurl.com/ ymjjj8sw; *compare* the Rules § 14 *with* the Rules (July 8, 2025) (attached as Ex. 1).

Previous versions of the Rules did not require speakers to reveal their exact residential address, allowing them to state their business address, or provide any address at all. *Compare* the Rules § 2 (Oct. 14, 2025) *with* the Rules § 2 (July 8, 2025) (Ex. 1), *and with* the Rules § 2 (Feb. 13, 2024) available at https://tinyurl.com/hzn4vtfa.

But beginning with the May 13, 2025, and June 10, 2025 meetings, the Council began forcing speakers to list their address on the public comment

period signup form. *See* City of Monroe NC Government, *City Council Regular Meeting of May 13, 2025*, YOUTUBE, at 16:22-18:08 (May 13, 2025), https://tinyurl.com/3vwah4wm, Metzger Decl. ¶ 9 (Ex. 2); City of Monroe NC Government, *City Council Regular Meeting of June 10, 2025*, YOUTUBE, at 27:00-30:09 (June 10, 2025), https://tinyurl.com/mr389c43, Ex. 2 ¶ 10. And then, on July 8, 2025, the Council amended the rules to compel speakers to "verbally state their name, street address, city, and state when called to speak prior to making any public comments," in addition to providing this same information on the signup form. The Rules § 2 (July 8, 2025) (Ex. 1); City of Monroe NC Government, *City Council Regular Meeting of July 8, 2025*, YOUTUBE (July 8, 2025), https://tinyurl.com/ad6w7ejc, Ex. 2 ¶ 11.

Now disclosure of a speaker's exact "personal primary residence and not business or other address" is required to be written on the signup form and be spoken just before remarks are made to the council. The Rules § 2 (Oct. 14, 2025).

**B. The Rules regulate the content of a person's speech.**

The Rules also regulate the content of each public comment period participant's speech to the council. Section 6 states:

> Yelling, making threats, insulting, or rude comments directed towards the Mayor, City Council, City staff or a member of the public will not be tolerated. Profanity, abusive language, public ridicule, or personal attacks will not be tolerated. A speaker that fails to maintain proper decorum may be sanctioned including, but not limited to, forfeiting the remainder of their time, removal from the meeting premises, or other sanctions deemed appropriate.

And the Council uses the Rules to prohibit anyone from directly addressing a council member by name. Indeed, at the April 8, 2025, meeting a council member made a general announcement stating that pursuant to the Rules, "Don't direct any comments directly to [a] council member. . . . I would ask that you not direct your comments directly to a specific council person by name." *See* City of Monroe NC Government, *City Council Regular Meeting of April 8, 2025*, YOUTUBE, at 1:13:37-1:13:50 (April 8, 2025), https://tinyurl.com/38xz5zeh, Ex. 2 ¶ 8.

## II. Defendants use the Rules to intimidate and control speakers.

Defendants use the Rules to compel public comment period participants to reveal where they live to intimidate them from speaking. And they use the rules to control what participants can say to avoid negative criticism and prevent them from petitioning elected officials.

As stated above, the council told public comment period participants to not "direct any comment directly to [a] council member." City of Monroe NC Government, *City Council Regular Meeting of April 8, 2025*, YOUTUBE, at 1:13:37-1:13:50 (April 8, 2025), https://tinyurl.com/38xz5zeh, Ex. 2 ¶ 8.

At the June 10, 2025 Monroe City Council meeting,[1] Michelle Ball questioned whether a freedom of information request would reveal child pornography stored on a city council member's government issued mobile phone or computer. Then a council member angrily interrupted Ms. Ball's speech, told Ms. Ball that the

---

[1] This encounter may viewed at: City of Monroe NC Government, *City Council Regular Meeting of June 10, 2025*, YOUTUBE, at 35:45-50:16 (June 10, 2025), https://tinyurl.com/mr389c43, Ex. 2 ¶ 10.

content of her speech was "absolutely unacceptable," and demanded that the meeting pause for a five-minute recess. The motion for a recess carried.

After the recess, the Mayor chastised Ms. Ball for alleging that a city council member may possess illegal materials on their government issued devices, told her to not disrupt the order of the meeting, warned her to not to raise her voice, and told her to not speak again about whether a council member possessed child pornography on their government issued electronic devices.

Ms. Ball continued her remarks. But before she finished, Ms. Ball explained that disclosing her home address just to speak to the council has resulted in threats to her and her children's physical safety.

Also at the June 10 meeting,[2] Jen Sanders explained that her family was being harassed at her residence because of the home address disclosure requirement. Subsequently, she was sanctioned for calling the mayor's associates "goons" and for saying that they were "spreading lies and causing trouble."

At the July 8, 2025 Council meeting,[3] William Wolfe was called on to speak during the public comment period, but he voluntarily forfeited his time to speak. Wolfe was intimidated from speaking because of the residential address disclosure

---

[2] This encounter may be viewed at: City of Monroe NC Government, *City Council Regular Meeting of June 10, 2025*, YOUTUBE, at 1:13:24-1:14:14 (June 10, 2025), https://tinyurl.com/mr389c43, Ex. 2 ¶ 10.
[3] This encounter may be viewed at: City of Monroe NC Government, *City Council Regular Meeting of July 8, 2025*, YOUTUBE, at 1:48:26-1:48:50 (July 8, 2025), https://tinyurl.com/ ad6w7ejc, Ex. 2 ¶ 11.

rule and stated, "I'm not going to endanger my family or my small children by putting my home address out here, and, forever online on YouTube."

Also at the July 8, 2025 meeting,[4] Lori [LNU] questioned the council as to why she needed to state her street address when it was not required on other occasions. She expressed concern about the requirement and stated she did not provide her personal primary residence address on the sign-up sheet because, "I felt that it would endanger me." After being told she would forfeit her speaking time if she did not reveal her address, Lori reluctantly stated her address and made her remarks.

At the September 23, 2025,[5] City Council meeting, Michelle Ball was prevented from petitioning a city council member and from negatively criticizing that city council member directly by name. Indeed, she was ordered not to make direct comments toward any council member. Then Ms. Ball was approached by a law enforcement officer and ejected from the meeting without finishing her comments.

## III. The impact that the Defendants' use of the Rule has had on the Plaintiff.

The defendants' use of the Rules has had a significant negative impact on plaintiff Lisa Metzger's First Amendment rights. Ms. Metzger regularly attends and speaks during the public comment period at Monroe City Council meetings. *See* Ex. 2 ¶¶ 4-6. She knows defendants use the Rules' address disclosure requirement and

---

[4] This encounter may be viewed at: City of Monroe NC Government, *City Council Regular Meeting of July 8, 2025*, YOUTUBE, at 1:53:10-1:53:58 (July 8, 2025), https://tinyurl.com/ad6w7ejc, Ex. 2 ¶ 11.
[5] This encounter may be viewed at: City of Monroe NC Government, *City Council Regular Meeting of September 23, 2025*, YOUTUBE, at 49:40-52:19 (Sep. 23, 2025), https://tinyurl.com/4hd7yv9x, Ex. 2 ¶ 13.

content regulations to prevent people from directly speaking to city council members. *Id*. at ¶¶ 14, 17-19.

Ms. Metzger witnessed how the home address disclosure rule caused William Wolfe to decline to speak out of fear for the safety of himself and his family due to the home address disclosure. *Id*. at ¶ 6. She heard Lori [LNU] talk about how revealing her home address would endanger her. *Id*. Ms. Metzger shares these same concerns for her safety and for the safety of her property so she discloses her business address instead of her home address. *Id*. at ¶ 15. Even so she has received death threats, mail from the Satanic Temple, and other intimidating communications. *Id*. She has personal knowledge that her friend Michelle Ball has received mail from the Satanic Temple at her personal primary residence as well as other intimidating communications and items from anonymous sources. *Id*. at ¶ 16. Accordingly, Ms. Metzger refuses to reveal her home address. *Id*. at ¶ 15.

But even before the residential address mandate took effect, the Rules were altering and "chilling" her speech. Ms. Metzger saw her friend Michell Ball be sanctioned, censored, chastised, and ejected from a City Council meeting for what she said to the council. *Id*. at ¶ 5. She witnessed the Council censor Jen Sanders for criticizing the mayor's associates. *Id*. Accordingly, Ms. Metzger self-censored the content of her speech during the public comment period because she was fearful that she will be censored, sanctioned, forced to forfeit her speaking time, or ejected from a City Council meeting just like others have experienced. *Id*. at ¶¶ 20-25.

Ms. Metzger wants to express her point of view without being silenced by the Council. *Id.* at ¶ 22. But she knows the defendants will interrupt, censor, and silence individuals that criticize them. *Id.* at ¶¶ 19-25. Because what speech is "rude," "insulting," or "abusive" is undefinable, she must steer far wider of saying anything that the mayor may deem in appropriate under these prohibitions. *Id.* at ¶¶ 22-23. Thus, Ms. Metzger self-censors her remarks and her speech is chilled. *Id.* at ¶¶ 20-21. And because any direct criticism of a council member may be considered "public ridicule" or a "personal attack," the Rules not only take away her right to express her views on the performance of the members of the City Council, but also her right to petition. *Id.* at ¶¶ 24-25.

## Legal Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013).

## Argument

## I. Plaintiffs are likely to prevail on the merits.

### A. The Rules violate the Free Speech Clause.

Under the Speech Clause of the First Amendment, "a government, including a municipal government vested with state authority, has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed*

*v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (internal quotation marks omitted). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id*.

The Rules § 6 regulates the content of speakers that participate in the public comment period because it only applies when certain ideas or messages are expressed.

"[W]hen the government opens its property to private speech, it may not discriminate based upon the viewpoint of the speaker, and it must also respect the lawful boundaries it has itself set." *Child Evangelism Fellowship v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1067 (4th Cir. 2006) (internal quotation marks omitted). "The ban on viewpoint discrimination is a constant. Beyond this, speakers' rights depend upon how widely the government has opened its property and its purposes in doing so." *Id*. Accordingly, how the Rules may regulate the content of speakers' speech during the public comment period depends on the type of forum Monroe created at its City Council meetings, which is either a "traditional public forum[ ], non-public forum[ ], [or] limited (or designated) public forum[ ]." *ACLU v. Mote*, 423 F.3d 438, 443 (4th Cir. 2005).

### 1. The public comment period is a traditional public forum and the Rules fail strict scrutiny.

A "traditional public forum, is a place that by long tradition or by government fiat has been devoted to assembly and debate." *Goulart v. Meadows*, 345 F.3d 239, 248 (4th Cir. 2003) (internal quotation marks omitted). "The Supreme Court has also identified the 'meeting hall' as a traditional public forum." *Id*. at n.8.

Traditional public forums "are subject to stringent First Amendment protection." *Sons of Confederate Veterans v. City of Lexington*, 722 F.3d 224, 229 (4th Cir. 2013). Specifically, "governmental restriction on speech in a public forum is subject to strict scrutiny, which requires the proponent of the restriction to show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id.* (internal quotation marks omitted).

The Monroe City Council invites anyone from anywhere to share their views on whatever topic the speaker thinks deserves the Council's attention. *See* the Rules §§ 2, 4. Therefore, the public comment period at Monroe City Council meetings is a traditional public forum, i.e., a "meeting hall," created "by government fiat." *Goulart*, 345 F.3d at 248 & n.8. Accordingly, strict scrutiny applies to the Public Comment Period and the Rules.

The Rules § 6 is facially unconstitutional. Defendants have no compelling interest that supports the content regulations in Rules § 6. And because "[g]iving offense is a viewpoint," *Matal v. Tam*, 582 U.S. 218, 243 (2017), the regulations are tailored to exclude these negative viewpoints, which is viewpoint discrimination. "[T]he public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Id.* at 244 (internal quotation marks omitted). Therefore, the Rules § 6 fails strict scrutiny and is facially unconstitutional.

## 2. Even if the public comment period is a limited public forum, strict scrutiny still applies.

Even if the public comment period is deemed a limited public forum, i.e., a forum reserved "for certain groups or for the discussion of certain topics," *Goulart*, 345 F.3d at 253, strict scrutiny still applies.

Monroe cannot "open a meeting to the public and then prohibit . . . speech simply because of [who the speaker] is or what [the speaker] wish[es] to say." *Hickory Fire Fighters Asso., etc. v. Hickory*, 656 F.2d 917, 922 (4th Cir. 1981). "After determining that a limited public forum exists, a court must next determine whether an internal or external standard should apply." *Mote*, 423 F.3d at 444; *see Goulart*, 345 F.3d at 250. Which standard applies dictates what level of scrutiny a court uses to assess a restriction on speech.

An "internal standard" applies when: "the government excludes a speaker who falls within the class to which a designated [i.e., limited] public forum is made generally available. In this situation, the government's action is subject to strict scrutiny. In other words, as regards the class for which the forum has been designated, a limited public forum is treated as a traditional public forum." *Goulart*, 345 F.3d at 250 (internal citations and quotation omitted).

An "external standard applies if the person excluded is not a member of the group that the forum was made generally available to." *Mote*, 423 F.3d at 444.

Because the public comment period is open to everyone to speak on whatever topic concerns them, *see* the Rules §§ 2, 4, everyone falls within the class of people to whom the public comment period is open: persons that wish to address the

Monroe City Council on a matter that is important to them. Therefore, this purportedly "limited public forum is treated as a traditional public forum." *Goulart*, 345 F.3d at 250, and strict scrutiny applies.

As explained above, defendants have no compelling interest to support the Rules § 6. And it is tailored to exclude viewpoints. Accordingly, the Rules § 6 is facially unconstitutional.

### 3. Section 6 is unconstitutional even under a lower scrutiny standard.

Even if the limited public forum external standard applies, *see Mote*, 423 F.3d at 444, speech regulations must still "be viewpoint neutral and reasonable in light of the objective purposes served by the forum." *Id.* at 444; *see Goulart*, 345 F.3d at 251.

The Rules § 6 is neither facially viewpoint neutral nor reasonable. Therefore, it is facially unconstitutional.

Indeed, the Rules are not content neutral. The Fourth Circuit has repeatedly held that *Reed* abrogated its content neutrality test by relegating the "purposes" for opening a forum inquiry to a later analytical step. *See e.g.*, *Cent. Radio Co. Inc. v. City of Norfolk*, 811 F.3d 625, 632 (4th Cir. 2016); *Cahaly v. Larosa*, 796 F.3d 399, 404-05 (4th Cir. 2015) (observing *Reed* "conflicts with" and "abrogates" our "previous descriptions of content neutrality").

Courts must now "begin [the] analysis by considering whether the [regulation] 'applie[d] to particular speech because of the topic discussed or the idea or message expressed.'" *Cent. Radio Co.*, 811 F.3d at 633 (quoting *Reed*, 576 U.S. at 171). Only

if this step is satisfied do courts examine whether the regulation's justifications are unrelated to content. *Id*. at 632.

Under this approach, the Rules are not content neutral. Section 6's prohibitions either "appl[y] or d[o] not apply as a result of content, that is, 'the topic discussed or the idea or message expressed.'" *Cent. Radio Co.*, 811 F.3d at 633 (quoting *Reed*, 576 U.S. at 171). To know whether § 6 applies, defendants must determine whether the speech is "insulting or rude" or contains "profanity, abusive language, public ridicule, or personal attacks." The Rules § 6. The flipside of this evaluation are statements that contain speech that portrays the City Council as "likeable," "respectable," or "sensible," or subjects it to "adoration," "praise," "esteem," or "adulation." Such content inquiries create the threat of viewpoint discrimination. *See R.A.V. v. St. Paul*, 505 U.S. 377, 387, 391 (1992) (content discrimination "raises the specter" of viewpoint discrimination; holding that "practical operation" of ordinance goes beyond content discrimination "to actual viewpoint discrimination").

The First Amendment does not "indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process. Indeed, governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views." *Cohen v. California*, 403 U.S. 15, 26 (1971). The Supreme Court has therefore found rules that prohibit "immoral or scandalous" speech to be viewpoint discrimination because it only allows speech "when their messages accord with, but

not when their messages defy, society's sense of decency or propriety." *Iancu v. Brunetti*, 588 U.S. 388, 394 (2019).

This is "a bedrock First Amendment principle: Speech may not be banned on the ground that it expresses ideas that offend." *Tam*, 582 U.S. at 223. "It is 'the proudest boast' of our First Amendment 'that we protect the freedom to express 'the thought that we hate.'" *United States v. Hudak*, __ F.4th __, 2025 U.S. App. LEXIS 26026 at *14 (4th Cir. 2025) (quoting *Tam*, 582 U.S. at 246).

"[T]he government may not censor speech merely because it is 'offensive to some.'" *Ison v. Madison Local Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 894 (6th Cir. 2021) (quoting *Tam*, 582 U.S. at 244). Section 6's prohibition on "insulting" or "rude" language that is "directed towards that Mayor, City Council, City staff, or a member of the public," is viewpoint discrimination and facially unconstitutional.

The same is true with the § 6 prohibitions on "[p]rofanity, abusive language, public ridicule, or personal attacks." "A prohibition on all offensive—[ ]—speech may appear neutral. After all, it prohibits a speaker from saying anything offensive about any person or any topic. But '[g]iving offense is a viewpoint.'" *Moms for Liberty v. Brevard Pub. Sch.*, 118 F.4th 1324, 1334 (11th Cir. 2024) (quoting *Tam*, 582 U.S. at 243) (citing *Brunetti*, 588 U.S. at 396). Restrictions barring these negative viewpoints "effectively requires 'happy-talk,' permitting a speaker to give positive or benign comments, but not negative or even challenging ones." *Id.* (quoting *Tam*, 582 U.S. at 246). Therefore, because § 6 facially discriminates on the basis of viewpoint, it is unconstitutional.

As applied, defendants use § 6 to control content and discriminate against speakers' viewpoints. The Council sanctioned Michelle Ball under § 6, ordering her to not ever speak about a Council Member possibly possessing child pornography. *See* City of Monroe NC Government, *City Council Regular Meeting of June 10, 2025*, YouTube, at 35:45-50:16 (June 10, 2025), https://tinyurl.com/mr389c43; Ex. 2 at ¶ 10. The Council also had law enforcement eject Ms. Ball from a meeting because she negatively criticized a city council member directly by name. *See* City of Monroe NC Government, *City Council Regular Meeting of September 23, 2025*, YouTube, at 49:40-52:19 (Sep. 23, 2025), https://tinyurl.com/4hd7yv9x; Ex. 2 at ¶ 13. And Jen Sanders was told she could not call the mayor's associates "goons" or say that they were "spreading lies and causing trouble." *See* City of Monroe NC Government, *City Council Regular Meeting of June 10, 2025*, YouTube, at 1:13:24-1:14:14 (June 10, 2025), https://tinyurl.com/mr389c43; Ex. 2 at ¶ 10. And after witnessing defendants apply § 6 like this to speakers since April 2025, *see* Ex. 2 at ¶¶ 5-7, the plaintiff self-censors her speech and does not fully exercise her free speech rights, *see id.* at ¶¶ 20-25, showing "a chilling effect on [her] free expression that is objectively reasonable." *Menders v. Loudoun Cty. Sch. Bd.*, 65 F.4th 157, 165 (4th Cir. 2023).

"In this country, we expect elected representatives to shoulder a degree of criticism about their public service from their constituents and their peers . . . When individuals consent to be a candidate for a public office conferred by the election of the people, they necessarily put their character in issue, so far as it may respect their fitness and qualifications for the office." *Hous. Cmty. Coll. Sys. v. Wilson*, 595

U.S. 468, 478 (2022) (cleaned up). Defendants do not understand this basic First Amendment principle. Accordingly, § 6 is also unconstitutional as applied.

**B. The Rules violate the Speech Clause by unreasonably compelling speech.**

It is "a basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say." *Agency for Int'l Dev. v. Alliance for Open Society Int'l, Inc.*, 570 U.S. 205, 213 (2013) (internal quotation marks omitted). Indeed, the Supreme Court has "held time and again that freedom of speech includes both the right to speak freely and the right to refrain from speaking at all." *Janus v. AFSCME, Council 31*, 585 U.S. 878, 892, (2018) (internal quotation marks omitted). "[A] person's right to refrain from speaking 'applies . . . equally to statements of fact the speaker would rather avoid.'" *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 879 F.3d 101 (4th Cir. 2018) (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995)).

"A regulation compelling speech is by its very nature content-based, because it requires the speaker to change the content of his speech or even to say something where he would otherwise be silent." *Stuart v. Camnitz*, 774 F.3d 238, 246 (4th Cir. 2014) (citing *Riley v. National Federation of Blind, Inc.*, 487 U.S. 781, 795 (1988)). By compelling speakers to "disclose certain identifying information regarding political speakers," . . . "potentially exposing those speakers to identification and harassment, First Amendment protections and values come into play." *Wash. Post v. McManus*, 944 F.3d 506, 515 (4th Cir. 2019).

And because compelled speech is subject to the same analysis as prohibitions from speaking, *see Riley*, 487 U.S. at 796-97, the compelled speech requirement of the Rules § 2 is subject to the same analysis as § 6. It fairs no better.

As explained above, whether Monroe City Council meetings are a traditional public forum or a limited public forum, § 2 must serve a government interest and be reasonable. In a traditional public forum, "restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Mansky*, 585 U.S. at 11. In a limited public forum when internal standards apply, strict scrutiny is still the standard. *See Goulart*, 345 F.3d at 250. And even in a limited public forum under external standards or a nonpublic forum, regulations on speech must be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Mansky*, 585 U.S. at 12 (internal quotation marks omitted); *see Mote*, 423 F.3d at 444 (external standards); *Goulart*, 345 F.3d at 251 (same).

Here, § 2 neither serves a government interest nor is reasonable. The Rules do not regulate public comment period participants based on where their residence is located. *See* the Rules §§ 2, 4. At most, a public comment period participant's residence sets the order for speakers, and even that order is based on the city a speaker lives in, which can be disclosed without revealing a speaker's residential address. *Id*. at § 4. Accordingly, whatever government interest defendants have is served by a speaker only disclosing the city and state of their residence. Therefore, disclosing a speaker's personal residential address does not serve any government

interest. And "[a] rule whose fair enforcement" does not serve any government interest "is not reasonable." *Mansky*, 585 U.S. at 19. Consequently, § 2 is facially unconstitutional.

Also, a constitutional violation can occur when speech regulations "deter[]" or "chill[]" speech. *Laird v. Tatum*, 408 U.S. 1, 11 (1972); *see also Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) ("[T]he alleged danger of this statute is, in large measure, one of self-censorship.").

Speakers being forced to state the address of their personal primary residence in order to participate in the public comment period weighs on speakers' minds, and inhibits their desire to keep speaking out on controversial issues out for fear of reprisal by those who do not tolerate their points of view. Accordingly, "the chilling effect of being forced to announce to all present one's actual home address before speaking on a hotly-contested issue is clear." *Marshall v. Amuso* 571 F. Supp. 3d 412, 426 (E.D.Pa. 2021). "Forcing commenters to disclose their home addresses before speaking on controversial or hot-button issues seems particularly likely to silence a would-be speaker." *Moms for Liberty - Wilson Cty. v. Wilson Cty. Bd. of Educ.*, No. 24-5056, 2025 LEXIS 23232 at *35 (6th Cir. Sep. 9, 2025) (Thapar, J. concurring).

Here, the evidence shows § 2 is chilling the speech of speakers at Monroe City Council meetings. Plaintiff is afraid to speak. *See* Ex. 2 at ¶¶ 14-16, 25. William Wolfe is afraid to speak, commenting, "I'm not going to endanger my family or my small children by putting my home address out here, and, forever online on

YouTube." *See* City of Monroe NC Government, *City Council Regular Meeting of July 8, 2025*, YouTube, at 1:48:26-1:48:50 (July 8, 2025), https://tinyurl.com/ad6w7ejc; Ex. 2 at ¶ 11. Lori [LNU] believed disclosing her residential address "would endanger" her. *See* City of Monroe NC Government, *City Council Regular Meeting of July 8, 2025*, YouTube, at 1:53:10-1:53:58 (July 8, 2025), https://tinyurl.com/ad6w7ejc; Ex. 2 at ¶ 11. And Michelle Ball explained that disclosing her home address just to speak to the Council has resulted in threats to her and her children's physical safety. *See* City of Monroe NC Government, *City Council Regular Meeting of June 10, 2025*, YouTube, at 35:45-50:16 (June 10, 2025), https://tinyurl.com/mr389c43; Ex. 2 at ¶ 10. As applied to the plaintiff, and other speakers, § 2 violates the First Amendment.

**C. The Rules violate the Petition Clause.**

"[T]he right to petition [i]s one of the most precious of the liberties safeguarded by the Bill of Rights." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 101 (2018) (internal quotation marks omitted). It "allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011). And it "undoubtedly does have force and application in the context of a personal grievance addressed to the government," because "[a]t the founding, citizens petitioned on a wide range of subjects, including matters of both private and public concern." *Id*. at 394.

Although "[c]ourts should not presume there is always an essential equivalence in the [Speech and Petition] Clauses or that Speech Clause precedents necessarily

and in every case resolve Petition Clause claims," *Guarnieri*, 564 U.S. at 388 (citation omitted), Petition Clause claims may be decided using Speech Clause analysis. *Id*. at 389.

Here, the analysis for plaintiff's speech claims, also proves her petition claims. Defendants use the Rules to prevent the plaintiff and other individuals from presenting their grievances. When defendants silence individuals because their comments are directed to a council member, or even merely mention a council member; or because their speech is allegedly insulting, rude, abusive, public ridicule or a personal attack to a council member, they violate the Petition Clause. Consequently, Plaintiffs are likely to succeed on the merits of their Petition Clause claims for the same reasons as their Speech Clause claims.

### D. The Rules are void for vagueness.

The Rules are unconstitutionally vague, granting the defendants the authority to sanction a speaker for whatever speech they believe is "rude," "insulting," or "abusive" or that they consider to be "public ridicule" or a "personal attack." The Rules § 6.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Vague laws raise "at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)). Indeed, indeterminate

prohibitions create opportunities for abuse through open-ended interpretation. *See*

*Mansky*, 585 U.S. at 21-22. The discretion that the mayor or whoever is the City

Council meeting's presiding officer "must be guided by objective, workable

standards. Without them [the official's] own politics may shape his views on what

counts as [prohibited speech]." *Id*.

A rule "is unconstitutionally vague if it (1) fails to provide people of ordinary

intelligence a reasonable opportunity to understand what conduct it prohibits or (2)

authorizes or even encourages arbitrary and discriminatory enforcement." *United*

*States v. Saunders*, 828 F.3d 198, 206 (4th Cir. 2016). And a "more stringent

vagueness test" is applied when First Amendment rights are at issue. *Vill. of*

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982).

The prohibitions against "rude," "insulting," or "abusive" speech or statements

considered to be "public ridicule" or a "personal attack" are "unreasonable because

[they] fail[] to define [these] key terms, lack[] any official guidance, and vests too

much discretion in those charged with [their] application." *Young Israel of Tampa,*

*Inc. v. Hillsborough Area Reg'l Transit Auth.*, 89 F.4th 1337, 1347 (11th Cir. 2024).

Indeed, the "[u]ncertain meanings" of these terms cause speakers, like the plaintiff,

"to steer far wider" from the prohibited zone than necessary, which, consequently,

consumes lawful speech at Council meetings. *Grayned*, 408 U.S. at 109; Ex. 2 at ¶¶

22-24. Therefore, they are unconstitutional.

### 4. The Rules are unconstitutionally overbroad.

The Rules are unconstitutionally overbroad, granting the defendants the authority to sanction a speaker for expressing protected speech that may be categorized as "rude," "insulting," or "abusive" or that they consider to be "public ridicule" or a "personal attack." The Rules § 6.

The overbreadth doctrine is similar, but not identical, to the vagueness doctrine. *See Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983) (explaining that "traditionally viewed vagueness and overbreadth as logically related and similar doctrines"). A claimant in an overbreadth challenge must show that "a regulation's overbreadth is not only real, but substantial as well, judged in relation to the challenged regulation's plainly legitimate sweep, and also that no limiting construction or partial invalidation could remove the seeming threat or deterrence to constitutionally protected expression." *Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 258 (4th Cir. 2003) (cleaned up). There "must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court . . . ." *United States v. Chappell*, 691 F.3d 388, 395 (4th Cir. 2012). Speech regulations cannot "sweep unnecessarily broadly and thereby invade the area of protect freedoms." *NAACP v. Alabama*, 377 U.S. 288, 307 (1964).

Here, the scope of the Rules allows the defendants to prohibit too much protected speech and do not catch any unprotected speech. For example, instead of only prohibiting unprotected "obscene" speech, *Miller v. California*, 413 U.S. 15, 36

(1973), or "fighting words," *Cohen v. California*, 403 U.S. 15, 20 (1971), the defendants use the Rules' vague and overbroad terms to silence speech common in today's political discourse. Accordingly, the Rules are unconstitutionally overbroad.

**B.    Plaintiff will suffer irreparable harm without injunctive relief.**

"There can be no question that the challenged restrictions, if enforced, will cause irreparable harm. 'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Roman Catholic Diocese v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). And "in the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009). Accordingly, because plaintiff demonstrated a likelihood of success on the merits of her claims, she has also demonstrated irreparable harm.

**C.    The balance of equities favors the plaintiff.**

Plaintiff's interests are burdened more without equitable relief than the burden the defendants' interests suffer with an injunction. The government "is in no way harmed by issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013) (quotation marks omitted).

**E.    The public is served by protecting constitutional rights.**

"[U]pholding constitutional rights surely serves the public interest." *Id.*

- 24 -

## II. The Court should not set a bond.

A "district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013).

The Court should not require the plaintiff to post a bond because she has a high probably of success on her claims, defendants will not suffer any damages from the injunction, the government is the defendant, and First Amendment rights are at stake.

## Conclusion

Plaintiff's motion for preliminary injunction should be granted.

Dated: November 5, 2025

/s/ Nathan Wilson
FOX ROTHSCHILD LLP
301 Hillsborough St.
Suite 1120
Raleigh, NC 27603
(919) 719-1269
nwilson@foxrothschild.com

and

Ryan Morrison*
LIBERTY JUSTICE CENTER
7500 Rialto Blvd.
Suite 1-250
Austin, TX 78735
(512) 481-4400
rmorrison@ljc.org
* *Pro hac vice admission forthcoming*

*Counsel for Plaintiff*